IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| SOUTH BOSTON ENERGY LLC, D/B/A<br>NOVEC ENERGY PRODUCTION<br>HALIFAX COUNTY BIOMASS,<br><br>*Plaintiff*,<br>v.<br><br>HARTFORD STEAM BOILER<br>SPECIALTY INSURANCE COMPANY,<br><br>*Defendant*. | Case No. 1:18-cv-596 |

## MEMORANDUM OPINION

This matter comes before the Court on Defendant's Motion for Summary Judgment, Dkt. 90, and Plaintiff's Motion for Attorney's Fees and Costs. Dkt. 78. For the following reasons Defendant's Motion for Summary Judgment is denied. Plaintiff's Motion for Attorney's Fees and Costs is granted.

### I. Background

This case, which involves a dispute between a Virginia power plant and its insurer, begins in Poland. There, during the manufacture of a 50MW Alstom Steam Turbine Generator (the "turbine"), a foreign metal object somehow made its way into the turbine and evaded detection. The turbine was then shipped to the United States – with the foreign metal object onboard as a stowaway – where it became the centerpiece of Plaintiff NOVEC's biomass power plant in South Boston, Virginia. NOVEC then operated the turbine for approximately two-and-a-half years without any known issues.

1

The foreign metal object was finally discovered in April 2016 when General Electric ("GE") conducted a routine borescope inspection of the turbine during a planned maintenance outage. Upon discovery of the foreign metal object, NOVEC contacted Alstom, the turbine's original equipment manufacturer. Alstom advised NOVEC that continuing to operate the turbine with the foreign metal object inside would put the turbine at risk. NOVEC then hired Turbine Generator Maintenance, Inc. ("TGM") to disassemble and inspect the turbine to assess the damage the foreign metal object had caused.

Because of the size of the turbine, this disassembly process was extensive. TGM hired 90- and 250-ton cranes to remove the turbine's building enclosure and lift the turbine's upper casing and rotor out of the building. Once TGM gained access to the turbine's internal components, it inspected each of them onsite. The components that required repair in GE's shop were shipped there for GE's evaluation, repair recommendations, and repairs. The inspection of the turbine's internal components revealed damage to the turbine's blades and seals.

On May 18, 2016, Plant Manager John Rainey submitted a loss notice to NOVEC's insurance provider, HSB Specialty Insurance Company ("HSB"), Defendant in this action. NOVEC had a policy with HSB which insured against losses due to accidents inside the turbine that caused direct physical damage to the equipment up to $175 million. The policy had a $500,000 deductible.

Rainey's initial loss notice stated that the "Probable Amount Entire Loss" was $450,000. Jill Baur, a claims adjuster for HSB responded that based on that number the cost to service the turbine was below the deductible. NOVEC's risk manager, Brian Cornell responded within fifteen minutes and stated that in a previous email between Rainey and NOVEC's CEO, "it was stated the total cost could be 1 million or so." Rainey also responded, saying "[t]he cost of

removal will include rental services of a crane, the disassembly and reassembly of the turbine, the actual shop repairs, the alignment determination, the root cause analysis, and any other potential charges necessary to restore the unit to operating parameters." Baur copied portions of this exchange into her claim file notes but did not include the statement that the claim could total "1 million or so."

HSB then hired Harold Ornstein to investigate the loss. Ornstein inspected the turbine in person at the GE facility on May 23, 2016. In his initial report, Ornstein informed HSB that there was damage to the seals that appeared to have occurred as a result of two vibration events and that the initial GE estimate for repairs may be cut back because not all of the seals were damaged. HSB requested that Ornstein supplement this initial report with more detail.

A couple weeks later, on June 6, 2016, Rainey and Baur spoke on the phone about the costs NOVEC incurred in disassembling the turbine. Baur's notes in her case file detail these costs as "TGM $450K Disassembly/Reassembly Shop[,] $450K blade carriers which doesn't include seals or pistons[,] Crane rental $150K."

By the end of June, HSB had engaged another engineer to examine the damage done to the turbine. On June 22, 2016, Ed Paprocki, a member of HSB's engineering division, submitted a report to Baur in which he analyzed photos of the turbine and reports about the turbine. Based on his analysis of the photos and reports, Paprocki concluded that there was no evidence of a mechanical breakdown or component liberation. He stated that the seal and cover damage was likely to have been caused by startup/shut down rubs. He conceded the damage to the trailing edge of the airfoils in Blade Carrier 2 could have been caused by the foreign object, but stated this would depend on where the object was discovered – something he did not know at the time of his report. Based on his review of the photos and reports, Paprocki calculated the damages

caused by the foreign metal object to total at most $39,710, and that the total repair cost, including disassembly and reassembly of the turbine would top out at $484,030.80. He stated this estimate was based on his experience watching people do repair work at sites.

Ornstein submitted his final report on August 5, 2016. The report stated that "the bulk of the damage" was caused by "one or more foreign objects," which were "rubbed by rotating blades," causing "vibration anomalies" that damaged the seals. The report did not provide an estimate or analysis of the alleged damages or of the necessary repair scope. Ornstein also referred to the turbine as a gas turbine in the report.

On August 18, 2016, HSB retained Marcus Crahan, a third engineer, to review the claim. Crahan concluded that the issues with the seals were attributable to normal wear and tear and there was "no evidence or indication of sudden physical damage from liberation of a foreign object." Crahan estimated the total costs to disassemble the turbine, remove the foreign metal object, repair the damage observed to the trailing edge of the airfoils in Blade Carrier 2, and reassemble the turbine at $399,700.

Crahan also at HSB's request reviewed NOVEC's invoices. Crahan had four takeaways. First, Crahan noted that another company's proposal to overhaul the steam turbine did not include all the work needed. Crahan suggested contacting a third shop for a quote on the same work scope. Second, Crahan noted a justification to justify balancing the rotor was not included, something that absent justification HSB should not cover. Third, Crahan stated that South Boston overpaid on crane services because the crane company charged them for twenty-four hours per day despite not working for twenty-four hours per day. Finally, Crahan asked if Baur would like him to forensically analyze the TGM charges. Crahan notes that this would cost "$$," but "TGM's bill is 50% of the total cost, so it's a big nut." Baur did not request a forensic analysis of

TGM's charges. Crahan's company, Power Engineering, also reviewed NOVEC's invoices, and on September 21, 2016, emailed Baur that overall, apart from "a few ambiguous line items," the "invoicing seems reasonable."

Nine days later, on September 30, 2016, HSB informed South Boston that its investigation revealed the amount of loss did not exceed the $500,000 deductible and that it would refuse coverage. This litigation followed in which NOVEC sought $770,635 in damages in addition to pre- and post-judgment interest. Before trial, HSB filed a Motion to Bifurcate NOVEC's request for attorney's fees and a Motion for Summary Judgment on whether HSB denied NOVEC's claim in bad faith. The Court granted the Motion to Bifurcate and denied the Motion for Summary Judgment as untimely.

After a jury trial held May 6 to May 9, 2019, the jury returned a verdict in favor of Plaintiff for $770,634.52 in damages and $133,014 in pre-judgment interest. Now that a jury has found HSB liable, HSB's Motion for Summary Judgment on the bad faith issue is timely, as is NOVEC's Motion for Attorney's Fees.

## II. Bad Faith

The Court may only award attorney's fees in this case if it makes a finding of bad faith on the part of the insurer. VA. CODE § 38.2-209. The Virginia Supreme Court has put forward factors for courts to consider when conducting a bad faith analysis. They include, (1) "whether reasonable minds could differ in the interpretation of policy provisions defining coverage and exclusions;" (2) "whether the insurer had made a reasonable investigation of the facts and circumstances underlying the insured's claim;" (3) "whether the evidence discovered reasonably supports a denial of liability;" (4) "whether it appears that the insurer's refusal to pay was used merely as a tool in settlement negotiations;" and (5) "whether the defense the insurer asserts at

trial raises an issue of first impression or a reasonably debatable question of law or fact." *Cuna Mut. Ins. Soc. v. Norman*, 375 S.E.2d 724, 727 (Va. 1989). To avoid a finding of bad faith, the insurer's investigation need only be reasonable, not perfect. *Spence-Parker v. Maryland Ins. Group*, 937 F. Supp. 551, 558 (E.D. Va. 1996).

Here there was no debate over whether the policy applied, the only settlement discussions in the case were court-ordered, and there was no matter of first impression, so only the second and third factors are relevant.

Here, HSB did not conduct a reasonable investigation and the evidence does not support a denial of coverage. Baur was informed in her very first email exchange with NOVEC that the repairs would total "$1 million or so." Baur was also told in June 2016 that the turbine disassembly/reassembly and crane rental alone would cost $450,000 and $150,000, respectively, which put NOVEC well above the $500,000 deductible amount even before accounting for any repair costs. Further, in August 2016 Baur completed her own initial invoice review and noted "the total for all repairs including replacement $1,180,172.41. Total potential EB-PD [Equipment Breakdown – Property Damage] claim amount including final return transport and crane rental $720,282.41 (gross of deductible)."

In the face of her knowledge of these actual costs, instead of facilitating price comparison quotes from other vendors, or forensically analyzing the bill from TGM, Baur relied on estimates given to her by Paprocki and Crahan to arrive at her conclusion that the claim fell below the deductible. These estimates were not based on any on-site observations of the turbine or its components, the actual prices NOVEC paid vendors for the repair services, or even the actual prices of comparable vendors that NOVEC could have enlisted to perform the repairs. Instead, the estimates were based on what Paprocki and Crahan believed the services should cost given

6

their experience in the field. HSB then accepted these estimates without question, despite the fact that NOVEC's actual costs, were over double the estimated amounts.

The law does not require an insurer's investigation to be perfect, and certainly downward adjustments are necessary in many insurance claims. However, this investigation – where the insurer adjusted the claim downward by over half the claimed amount, where this adjustment was based on mere estimates by engineers who had never viewed the turbine in person, where the insured's invoices were found to be "largely reasonable" and no evidence of quote comparisons has been presented, and where the final adjusted claim amount skirts just below the deductible reeks of bad faith. The investigation was not reasonable and the denial of coverage was not supported by the evidence.

For these reasons the Court finds HSB denied coverage in bad faith.

### III. Attorney's Fees and Costs

Because the Court finds that HSB denied NOVEC's insurance claim in bad faith, it may award attorney's fees. When shaping an award of attorney's fees, the court "must first determine a lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate." *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243 (4th Cir. 2009). To do this, the court considers the twelve factors set out in *Johnson v. Georgia Highway Express, Inc.*:

> (1) The time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

488 F.2d 714, 717–19 (5th Cir. 1974). Although each factor is persuasive, the court need not consider each of them individually because they all are "subsumed" into an analysis of what constitutes a reasonable rate and number of hours expended. *Smith v. Loudoun Cty. Pub. Sch.*, 2017 WL 176510 at *2 (E.D. Va. Jan. 17, 2017).

*A. Lodestar Calculation*

i. Reasonable Rate

The reasonable rate for attorney's fees is determined based on the "prevailing market rates in the relevant community factoring in any required skill or experience." *Burke v. Mattis*, 315 F. Supp. 3d 907, 913 (E.D. Va. 2018). This Court follows the *Vienna Metro* Matrix as a guide for reasonable rates in Northern Virginia. *Id.*

Here, NOVEC's attorneys have suggested a blended hourly rate of $507.63. NOVEC arrived at that rate by multiplying the total hours billed by each timekeeper's standard hourly rate, then took the average of that total. Because NOVEC's counsel moved firms multiple times during this litigation, with their standard rates changing at each firm, and because that hourly rate falls within the prescribed Vienna Metro matrix range for NOVEC's attorney's, NOVEC's attorneys suggest the Court apply this blended rate for ease of calculation.

HSB argues that because NOVEC's attorneys worked under a contingency fee arrangement for part of this litigation they should be precluded from requesting their standard hourly rates. However, the Fourth Circuit has rejected the argument "that a court can do no more than enforce the terms of the contingent fee contract." *Allen v. United States*, 606 F.2d 432, 435 (4th Cir. 1979). Further, the Fourth Circuit has emphasized that even when a contingency fee arrangement exists, when determining a reasonable rate for attorney's fees a court must still consider all of the *Johnson* factors.

Here, the first, fourth, fifth, and eighth *Johnson* factors are especially implicated. This litigation lasted for over two years, NOVEC's three trial counsel comprise their entire law firm, preventing them from taking on more work, NOVEC's attorneys' standard rates are significantly above the $200/hour contingency fee agreement, and NOVEC's attorneys won a six-figure damages verdict for their client, plus pre-judgment interest. These factors suggest that restricting NOVEC's attorneys' fees to their fee agreement is not appropriate and the Court will apply NOVEC's suggested blended rate of $507.63.

ii. Reasonable Hours

The Court finds three grounds for reducing the total fee amount: (1) inadequate documentation of time entries, (2) excessive time spent on fee petition, and (3) travel time billed at regular rates. HSB argued the total fee amount should also be reduced because NOVEC overstaffed the case. The Court does not find that argument persuasive.

*a. Inadequate Documentation*

Block billing is "grouping, or lumping several tasks together under a single entry, without specifying the amount of time spent on a particular task." *Page*, 2015 U.S. Dist. LEXIS 180310, at *33–34 (quoting *Guidry v. Clare*, 442 F. Supp. 2d 282, 294 (E.D. Va. 2006)). It is appropriate to reduce the total fee award for block billing because block billing prevents a court from making "an accurate determination of the reasonableness of the time expended in the case." *Id.* at *34. This Court has previously imposed 10% and 20% fee reductions for block billing. *Id.* (imposing a 20% reduction for block billing; citing to two recent cases that imposed 10% and 20% reductions for block billing).

Billing entries must "describe specifically the tasks performed." *Id.* at *34–35 (quoting *Rum Creek Coal Sales v. Caperton*, 31 F. 3d 169, 175 (4th Cir. 1994). This is because vague

billing entries present the same problem as block billed entries – in both cases the court cannot "weigh the hours claimed and exclude hours that were not reasonably expended." *Id.* at *35.

In its review of the bill, the Court identified many instances of block-billed and vague time entries. The frequency of these inadequately documented time entries warrants a reduction to the total fee award. As a result, the Court will apply an across-the-board reduction of 10% to Plaintiff's total hours.

### b. Excessive Hours Spent on Fee Petition

While the Fourth Circuit allows parties to recover costs related to the preparation of fee petitions, the amount collected may not be unreasonable. *EEOC v. Service News Co.*, 898 F.2d 958, 966 (4th Cir. 1990); *Daly v. Hill*, 790 F.2d 1071, 1080 (4th Cir. 1986). Further, work on a fee petition is "relatively straightforward" and "much of it [can] be delegated to staff." *Capital Hospice v. Global Lending, LLC*, 2009 U.S. Dist. LEXIS 56673, at *12 (E.D. Va. Jul. 1, 2009) (reducing the hours spent preparing a fee petition in half because 12.7 hours spent on fee petition was unreasonable).

Plaintiff billed at least 29.8 hours of work on its fee petition. This number does not incorporate the entire amount of time Plaintiff spent on the fee petition because some of the fee petition work was block billed with other tasks. As a result the Court will apply an across-the-board reduction of 1.5% to Plaintiff's total hours.

### c. Travel Time

It is inappropriate to recover full fees for travel time. *Diaz v. Banh Cuon Saigon Rest., Inc.*, 2017 U.S. Dist. LEXIS 187252, *21 (E.D. Va. July 20, 2017). If the travel time has been block billed such that the Court cannot determine how much time was spent travelling, the Court

may reduce the overall fee award rather than engaging in calculations to determine travel hours. *Id.*

The Court's review of the bill revealed several instances where Plaintiff has billed for travel time. To account for these improperly billed hours the Court will apply an across-the-board reduction of 1.5% to Plaintiff's total hours.

*C. Lodestar Amount*

For the above reasons, the reasonable rate for NOVEC's attorneys is $507.63. The total hours billed is 1,305 (1,210 requested in NOVEC's original Motion for Attorney's Fees plus the 95 additional hours submitted as part of NOVEC's Reply brief accounting for work on briefing the Motion for Attorney's Fees and Motion for Summary Judgment). As previously stated, the Court will apply a 13% reduction to NOVEC's total hours, leaving the adjusted hours total at 1,135.4. Multiplying the adjusted hours by the reasonable rate produces a final lodestar amount of $576,337.72.

*D. Costs*

NOVEC has also requested $99,802.74 in costs. This includes $23,866.78 in litigation costs, $33,452.47 in expert fees in costs, $9,400.96 in eDiscovery costs, and $30,591.99 in trial technology consultant costs. HSB argues that the costs are inappropriate because cheaper eDiscovery platforms exist, NOVEC did not provide itemized receipts of travel expenses, and that NOVEC did not make any argument to justify the use of a technology consultant at trial.

The Seventh Circuit has acknowledged that when clients pay out of pocket for their legal expenses they have "an incentive to minimize [them] (for [they] might not be able to shift them." *Taco Bell Corp. v. Cont'l Cas. Co.*, 388 F.3d 1069, 1076 (7th Cir. 2004). The court went on to

point out "where there are market incentives to economize, there is no occasion for a painstaking judicial review." *Id.*

Despite claiming there are "drastically less expensive" eDiscovery platforms, HSB gives no examples of alternative eDiscovery platforms nor their discounted costs. Further, parties are not required to submit itemized receipts in order to recover for travel fees. Finally, use of a technology consultant is common practice, especially in a document-heavy case like this one. Because HSB has not raised any compelling arguments against NOVEC's costs, and because NOVEC had an incentive to minimize its costs because it might not be able to shift them, the Court will award costs in the amount of $99,802.74.

## IV. Conclusion

For the above reasons, Defendant's Motion for Summary Judgment, Dkt. 84, is denied. Plaintiff's Motion for Attorney's Fees and Costs, Dkt. 78 is granted. A separate order will issue.

It is **SO ORDERED**.

August 15, 2019
Alexandria, Virginia

Liam O'Grady
United States District Judge