# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
## Alexandria Division

| | |
|---|---|
| SOUTH BOSTON ENERGY LLC, d/b/a NOVEC ENERGY PRODUCTION HALIFAX COUNTY BIOMASS, *Plaintiff*, v. HARTFORD STEAM BOILER SPECIALTY INSURANCE COMPANY, *Defendant.* | Civil No. 1:18-cv-596 Hon. Liam O'Grady |

## MEMORANDUM OPINION & ORDER

Before the Court is Defendant Hartford Steam Boiler Specialty Insurance Company's ("HSB") Motion to Grant a New Trial and to Alter or Amend the Judgment. Dkt. 96. On October 31, 2019, the Court Granted in Part and Deferred in Part Defendant's motion (Dkt. 101), and consequently held a hearing on January 24, 2020, allowing Defendant to offer additional evidence on the issue of the bifurcated bad faith claim against HSB. The Parties briefed the issue after the evidentiary hearing and jointly submitted final exhibits and deposition designations.[1] As such, the Court addresses that portion of Defendant's motion previously deferred: to alter or amend the judgment.

## I. BACKGROUND

### A. Factual Background

For ease of reference, many of the relevant underlying facts are repeated here.

---

[1] At the January 24, 2020 hearing, Counsel were ordered to confer and agree as to proper exhibit numbers and to submit an accurate list as to what materials were referenced. Dkt. 112. On April 7, 2020, the Parties filed such a list. Dkt. 118.

This case involves a dispute between a Virginia power plant and its insurer. In Poland, during the manufacture of a 50MW Alstom Steam Turbine Generator (the "turbine"), a foreign metal object somehow entered the turbine and evaded detection. The turbine was then shipped to the United States, where it became the centerpiece of Plaintiff South Boston Energy LLC d/b/a NOVEC Energy Production Halifax County Biomass' ("NOVEC") power plant in South Boston, Virginia. NOVEC then operated the steam turbine for approximately two-and-a-half years without any known issues.

The foreign metal object was discovered in April 2016 when General Electric ("GE") conducted a routine borescope inspection of the turbine during a planned maintenance outage. Upon discovery of the object, NOVEC contacted Alstom, the turbine's original equipment manufacturer. Alstom advised NOVEC that continuing to operate the turbine with the foreign metal object inside would put the turbine at risk. NOVEC then hired Turbine Generator Maintenance, Inc. ("TGM") to disassemble and inspect the turbine to assess the damage the foreign metal object had caused.

Because of the size of the turbine, this disassembly process was extensive. TGM hired 90- and 350-ton cranes to remove the turbine's building enclosure and lift the turbine's upper casing and rotor out of the building. Once TGM gained access to the turbine's internal components, it inspected each of them onsite. The components that required repair in GE's shop were shipped there for GE's evaluation, repair recommendations, and repairs. The inspection revealed damage to certain of the turbine's blades and seals.

On May 18, 2016, Plant Manager John Rainey submitted a loss notice to NOVEC's insurance provider, HSB, Defendant in this action. NOVEC had a policy with HSB which

insured against losses due to accidents inside the turbine that caused direct physical damage to the equipment up to $175 million. The policy had a $500,000 deductible.

Mr. Rainey's initial loss notice stated that the "Probable Amount Entire Loss" was $450,000. Citing that number, Jill Baur, a claims adjuster for HSB, said the cost to service the turbine was below the deductible. NOVEC's risk manager, Brian Cornell, responded within fifteen minutes and stated that in a previous email between Mr. Rainey and NOVEC's CEO, "it was stated the total cost could be 1 million or so." Mr. Rainey also responded, saying "[t]he cost of removal will include rental services of a crane, the disassembly and reassembly of the turbine, the actual shop repairs, the alignment determination, the root cause analysis, and any other potential charges necessary to restore the unit to operating parameters." Ms. Baur copied portions of this exchange into her claim file notes but did not include the statement that the claim could total "1 million or so."

HSB then hired Harold Ornstein to investigate the loss. Dr. Ornstein inspected the turbine at the GE facility on May 23, 2016. In his initial report, Dr. Ornstein informed HSB that there was damage to the seals, apparently from two vibration events, and that the initial GE estimate for repairs may be cut back because not all of the seals were damaged. HSB requested that Ornstein supplement this initial report with more detail.

A couple weeks later, on June 6, 2016, Mr. Rainey and Ms. Baur spoke on the phone about the costs NOVEC incurred in disassembling the turbine. Ms. Baur's notes in her case file detail these costs as "TGM $450K Disassembly/Reassembly Shop[,] $450K blade carriers which doesn't include seals or pistons[,] Crane rental $150K."

By late June, HSB had engaged Ed Paprocki, a member of its own engineering division, to examine the damage done to the turbine again. On June 22, 2016, he submitted a report to

3

Ms. Baur in which he analyzed existing photos and reports of the turbine. Mr. Paprocki concluded that there was no evidence of a mechanical breakdown or component liberation, and that the seal and cover damage was likely caused by startup/shut down rubs. He conceded the damage to the trailing edge of the airfoils in Blade Carrier 2 could have been caused by the foreign object, but stated this would depend on where the object was discovered – something he did not know at the time of his report. Based on his review of the photos and reports, Mr. Paprocki calculated the damages caused by the foreign metal object to total at most $39,710. Mr. Paprocki's estimate was based on relevant photographs, reports, and his experience watching people do repair work at sites. Using this amount, Baur calculated the total repair cost, including disassembly and reassembly of the turbine, to top out at $484,030.80.

Dr. Ornstein submitted his final report on August 5, 2016. The report stated that "the bulk of the damage" was caused by "one or more foreign objects," which were "rubbed by rotating blades," causing "vibration anomalies" that damaged the seals. The report did not provide an estimate or analysis of the alleged damages or of the necessary repair scope.

On August 18, 2016, HSB retained Power Engineering's Marcus Crahan to review the claim. Mr. Crahan concluded that the issues with the seals were attributable to normal wear and tear and there was "no evidence or indication of sudden physical damage from liberation of a foreign object." Mr. Crahan estimated the total costs to disassemble the turbine, remove the foreign metal object, repair the damage observed to the trailing edge of the airfoils in Blade Carrier 2, and reassemble the turbine at $399,700.00.

Also at HSB's request, Mr. Crahan reviewed NOVEC's invoices. He had four takeaways. First, he noted that another company's proposal to overhaul the steam turbine did not include all the work needed. Mr. Crahan suggested contacting a third shop for a quote on the

same work scope. Second, he noted a justification to balance the rotor was not included, which was required for HSB coverage. Third, Mr. Crahan stated that NOVEC overpaid on crane services because the crane company charged for twenty-four hours per day despite not working for all twenty-four hours. Finally, he asked if Baur would like him to forensically analyze the TGM charges. Mr. Crahan noted that this would cost "$$," but "TGM's bill is 50% of the total cost, so it's a big nut." Power Engineering, reviewed NOVEC's invoices and on September 21, 2016, emailed Baur that, apart from "a few ambiguous line items," the "invoicing seems reasonable." Power Engineering generated a Gantt chart as part of its review.

Nine days later, on September 30, 2016, HSB informed NOVEC that its investigation revealed the amount of loss did not exceed the $500,000.00 deductible and that it would refuse coverage. This litigation followed.

### B. Relevant Procedural Background

NOVEC's Complaint included claims for breach of contract and for all reasonable legal fees and costs incurred, pursuant to Va. Code § 38.2-209. The claim for attorneys' fees and costs relied on the Court's finding of bad faith. On Defendant's motion prior to trial, the Court bifurcated the issues, limiting the trial to the breach of contract claim. Defendant also moved for Partial Summary Judgment that no bad faith existed, and the Court denied that motion without prejudice as premature. After a jury trial held May 6 to May 9, 2019, the jury returned a verdict in favor of Plaintiff for $770,634.52 in damages and $133,014.00 in pre-judgment interest.

Post-trial, Defendant renewed and supplemented its motion for partial summary judgment on the bad faith claim. An Order entered June 18, 2019 made clear that the bad faith issue pending in Defendant's motion was fundamental to Plaintiff's recovery of fees and costs. Indeed, the Court stated it would "not hold a hearing on Plaintiff's Motion for Attorneys' Fees

and Costs before Defendant's Motion for Partial Summary Judgment has been fully briefed." Dkt. 86 at 1. Defendant's motion was fully briefed, and the Court heard arguments on the motion on July 12, 2019. Having considered the facts of the case at great length, the Court then found that Defendant acted in bad faith, as its "investigation was not reasonable and the denial of coverage was not supported by the evidence." Dkt. 93 at 7. Accordingly, the Court granted Plaintiff's motion for attorney's fees and costs and the clerk entered judgment against HSB.

Defendant now argues that litigation of its motion for partial summary judgment did not allow for a full defense, and that Defendant would have proceeded differently had Plaintiff also filed for summary judgment on the same issue. The instant motion asks the Court to "(1) open the judgment, hold a trial on the previously bifurcated Virginia Code § 38.2-209 claim for bad faith, take additional testimony, amend its findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment, pursuant to Rule 59(a)(2) of the Federal Rules of Civil Procedure; and (2) to alter or amend the Court's Order and the Clerk's Judgment entered August 15, 2019 (ECF No. 94, 95)" pursuant to Rule 59(e). Dkt. 97 at 1.

The Court took additional testimony at Defendant's request and accommodated Defendant's scheduling needs, hearing HSB's proffered evidence on January 24, 2020. Based on the additional evidence and further review, the Court now declines to amend its findings or to direct the entry of a new judgment.

## II. LEGAL STANDARD

Under Rule 59(e) of the Federal Rules of Civil Procedure, a Court may reconsider an entry of summary judgment.[2] "Rule 59(e) motions can be successful in only three situations: (1)

---

[2] As is undisputed in the Parties' briefs, HSB moves the Court to take evidence on an issue that was not previously tried, thus Federal Rule of Civil Procedure 59(a), governing *new* trials either

6

to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Zinkand v. Brown*, 478 F.3d 634, 637 (4th Cir. 2007) (citing *Ingle v. Yelton*, 439 F.3d 191, 197 (4th Cir. 2006) (citing *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998))). "If the court elects to look at additional evidence represented as having been unavailable at the prior hearing, the court must satisfy itself as to the unavailability of the evidence and likewise examine the justification for its omission." *Zinkand*, 478 F.3d at 637 (citing *RGI, Inc. v. Unified Indus., Inc.*, 963 F.2d 658, 662 (4th Cir. 1992) (concluding that a district court can accept new evidence under Rule 59(e) as long as the party provides justification for why the evidence was not presented previously)).

"A Rule 59(e) motion 'may not be used [] to raise arguments which could have been raised prior to the issuance of the judgment, nor may they be used to argue a case under a novel legal theory that the party had the ability to address in the first instance.'" *Raynor v. G4S Secure Sols. (USA) Inc.*, 327 F. Supp. 3d 925, 934 (W.D.N.C. 2018), *aff'd*, 805 Fed. App'x 170 (4th Cir. 2020) (quoting *Pac. Ins.*, 148 F.3d at 403 (4th Cir. 1998)) (additional citations omitted). Indeed, "reconsideration of a judgment after its entry is an 'extraordinary remedy which should be used sparingly.'" *Projects Mgmt. Co. v. DynCorp Int'l, LLC*, 17 F. Supp. 3d 539, 541 (E.D. Va. 2014), *aff'd*, 584 Fed. App'x 121 (4th Cir. 2014) (quoting *Pac. Ins. Co.*, 148 F.3d at 403).

### III. DISCUSSION

The bad faith issue before the Court—awards of insured's attorney fees under Virginia Code § 38.2-209—has been briefed in some capacity at least four times in this case: before and

---

"after a jury trial" or "after a nonjury trial," will not govern. Fed. R. Civ. P. 59(a)(1)-(2); *see also* Dkt. 97 at 11 n.3; Dkt. 98 at 6.

7

after the breach of contract bench trial, and before and after the January 24, 2020 post-trial evidentiary hearing. Whether Defendant's conduct was "not in good faith" is a question of law for the Court. *Jeb Stuart Auction Servs., LLC v. W. Am. Ins. Co.*, No. 4:14-CV-00047, 2016 WL 3365495, at *3 (W.D. Va. June 16, 2016) (citing *REVI, LLC v. Chicago Title Ins. Co.*, 776 S.E.2d 808, 812 (Va. 2015)). Defendant has had multiple opportunities to be heard regarding bad faith, both in briefing and in open court. With this in mind, the analysis herein considers only those arguments that "could [not] have been raised prior to the issuance of the judgment." *Raynor*, 327 F. Supp. 3d at 934.

HSB's argument employs Rule 59(e) for "an 'extraordinary remedy which should be used sparingly,'" based on a procedural step that, even if erroneous, still must alter the weight of the evidence on this issue. *Projects Mgmt.*, 17 F. Supp. 3d at 541. The Court's simultaneous denial of HSB's partial summary judgment motion on bad faith and grant of NOVEC's motion for attorney's fees and costs amounted to sua sponte summary judgment for NOVEC, Defendant says. Due to the sua sponte nature of the judgment, HSB continues, the Court failed to provide an opportunity for it to establish a genuine issue of material fact. This argument is significantly weakened by "[t]he Supreme Court [holding] that the party moving for summary judgment must demonstrate that 'there is an absence of evidence to support the nonmoving party's case.'" [3]

---

[3] Defendant's position necessarily implies that neither its own summary judgment motion on bad faith nor its defense against Plaintiff's motion for fees and costs—which also turned on bad faith—allowed HSB to demonstrate a genuine issue of material fact pursuant to Rule 56. In other words, HSB says it would have supported its position differently—presumably more thoroughly, in light of the additional testimony at bar—had HSB been the nonmovant in a third motion on the same issue. This tenuous claim is further undermined given that HSB's Post-Trial Brief and Supplemental Memorandum in Support of its Motion for Partial Summary Judgment from June 2019, *"pursuant to . . . Rule 56 of the Federal Rules of Civil Procedure,"* directly responded to and "concern[ed] [NOVEC's] claim for attorney's fees pursuant to Virginia Code Section 38.2-209."[3] Dkt. 84 at 1 (emphasis added). Even if, *arguendo*, a procedural error

8

*Hughes v. Bedsole*, 48 F.3d 1376, 1381 (4th Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). In the interest of a complete record at the trial court level, however, the Court prudently granted HSB's request and received additional post-judgment evidence limited to the issue of bad faith.

As a final preface to this discussion, HSB repeatedly emphasizes NOVEC's burden to show bad faith, but this emphasis is untimely. *See* Dkt. 114 at 14 (citing *State Farm Mut. Auto. Ins. Co. v. Floyd*, 366 S.E.2d 93, 97-98 (Va. 1988)). NOVEC did not offer any additional witnesses at the January 24 hearing, and HSB's newly proffered evidence must disturb or negate the bad faith finding. Plaintiff largely rests on the findings in its favor, from both judge and jury, based on the record as it existed at the time of judgment. This motion is HSB's attempt to undermine the existing findings with additional evidence, and NOVEC's burden cannot be a persuasive line of argument at this stage; while the burden remains on NOVEC on the issue of bad faith, any claimed deficiency in Plaintiff's case was present prior to judgment.[4]

### A. <u>Additional Evidence Regarding the Bad Faith Inquiry</u>

Defendant articulates the bad faith issue as "a single, narrow inquiry – did HSB unreasonably disagree with its insured, [NOVEC], concerning the nature and the amount of the alleged loss[?]" Dkt. 52 at 1. The Supreme Court of Virginia's opinion in *Cuna Mut. Ins. Soc. v. Norman*, 375 S.E.2d 724 (Va. 1989) helps guide the overall reasonableness inquiry. *Norman* lays out five factors for consideration, which are, in short: (1) reasonable minds in interpreting the policy; (2) reasonable investigation of the claim; (3) reasonable evidence to support the

---

occurred, HSB does not articulate an argument for why its litigation strategy would have been so materially different as to warrant extraordinary relief under Rule 59(e).

[4] The post-judgment testimony NOVEC elicited on cross-examination—and the supplemental exhibits offered—were to negate or undermine the testimony HSB offered, not to expand its position post-judgment.

result; (4) the insurer's use of settlement tactics; and (5) issues of first impression.[5] HSB maintains that all five factors in *Norman* apply, whereas Plaintiff's argument focuses on factors two and three: the reasonableness of HSB's investigation and whether HSB reasonably denied coverage based on that investigation. The Parties' approaches were similar pre-judgment, where the Court agreed with Plaintiff that only factors two and three required significant attention. Here again, factors two and three are the basis of the material inquiries, as the Court's initial bad faith ruling held, "[t]he investigation was not reasonable and the denial of coverage was not supported by the evidence." Dkt. 93 at 7.

At the January 24 hearing, HSB's new evidence included testimony from three witnesses: Catherine Crahan, John Rainey, and Jill Baur. Deposition testimony was also received from Dr. Hal Ornstein. Mr. Rainey had previously testified at the May 2019 jury trial; Ms. Baur also testified by deposition designation at that trial.

Dr. Ornstein is an eminently qualified mechanical engineer, employed by EFI Global. The deposition testimony from Dr. Ornstein included an explanation of his involvement with the turbine examination and report as a third party. He visited GE's facility in Richmond and NOVEC's facility in Virginia to see the turbine parts, including damage to blades and seals.

---

[5] The *Norman* factors are specifically enumerated as follows:

> A bad-faith analysis generally would require consideration of such questions as whether reasonable minds could differ in the interpretation of policy provisions defining coverage and exclusions; whether the insurer had made a reasonable investigation of the facts and circumstances underlying the insured's claim; whether the evidence discovered reasonably supports a denial of liability; whether it appears that the insurer's refusal to pay was used merely as a tool in settlement negotiations; and whether the defense the insurer asserts at trial raises an issue of first impression or a reasonably debatable question of law or fact.

*Cuna Mut. Ins. Soc. v. Norman*, 375 S.E.2d 724, 727 (Va. 1989).

Ornstein Dep. Tr. 16:1-3. He expressed several methods of inquiry and physical evaluation that could have been done to complete a "full root cause failure analysis, and that is what [he] would want to do." *Id.* 16:13-15. Regarding the turbine parts, Dr. Ornstein testified that he got to see them, but "[he] didn't have an opportunity to do anything with it." Ornstein Dep. Tr. 17:13-14. One illustration of the admittedly shallow nature of Dr. Ornstein's examination was that he observed some separation at the turbine's seals, which can be characterized as seal damage. When asked if he had an opportunity to see the seal damage in person, he responded, "[n]ot – not to the level that you have to in order to . . . get down to the metallographic examination." Ornstein Dep. Tr. 50:17-19. In other words, "[he] could see certain separation, but [] could not see the actual failure planes." *Id.* 51:1-3.

Dr. Ornstein also testified to the information supplied to him regarding the "vibration anomalies" associated with the turbine damage. He had insufficient data to determine the timing, duration, magnitude, speed variations, or other relevant aspects of the vibration anomalies; Dr. Ornstein said, "I don't know what happened here . . . I cannot go ahead and stand and say I know for sure that this is what happened." Ornstein Dep. Tr. 53:20-54:3.

Ms. Crahan was the first live witness at the January 24 hearing. She works at Power Engineering along with her father, Marcus Crahan. In 2016, Power Engineering worked for HSB on its review of invoices related to NOVEC's steam turbine claim. Ms. Crahan organized invoices from the NOVEC claim, and corresponded with HSB's Jill Baur by email during the invoice review in September 2016. She commented that the invoices seemed reasonable, and testified that by "reasonable" she "meant that all of the invoicing that [she] received and entered . . . fell within a specific time period." Hr'g Tr. 18:17-19. Overall, HSB elicited testimony

11

suggesting Ms. Crahan's role in the review was limited to chronological organization of invoices.

Mr. Rainey works for NOVEC and was the plant manager for the instant turbine claim. At the January 24 hearing, part of his testimony involved "historian data that would substantiate the alleged vibration events," to which he previously testified in the May 2019 trial. Hr'g Tr. 28:23-24. As foundation for Ms. Baur's testimony, Counsel for HSB probed Mr. Rainey about three proposals NOVEC received for teardown, disassembly, and reassembly of the turbine. All but one of these bids were said to be withheld from Ms. Baur despite her request for all handling proposals NOVEC had received. On cross-examination, Counsel for NOVEC asked Mr. Rainey about quotes for other aspects of the proposed repair, and confirmed there were several other competitive bids for line items where HSB received only one preferred proposal.

Ms. Baur has extensive experience as an insurance claim adjuster and was working for HSB as a general adjuster during the period in question. As the primary adjuster on NOVEC's claim, Ms. Baur corresponded with NOVEC representatives, colleagues at HSB that contributed to the adjustment, and Power Engineering throughout her review of NOVEC's claim. She reviewed various submissions and estimates as to the characterization of the damage and proposed repairs, including three reports from engineers both internal and external to HSB. She had concerns about the extent of the damage, and whether the damage occurred prior to the inception of the policy, which would exclude it from coverage.

Ms. Baur held a peer-review within her division, or "consensus," on the NOVEC claim. Hr'g Tr. 60. This consensus led to HSB's engagement with Power Engineering for review of various documentation related to the claim. Ms. Baur testified that she relied on feedback from Marcus Crahan at Power Engineering as to the cause of the damage to the turbine, not from

Catherine Crahan, and that it was Catherine who said the invoices NOVEC provided looked "reasonable." *See* Hr'g Tr. 70:8-15. Ms. Baur maintains she requested information from Mr. Rainey related to the vibration anomalies at issue, but she never received the information from NOVEC. She also emphasized that the GE scope involved repair of all seals on the turbine when the reports she had suggested there was only damage to a portion of the seals.

HSB ultimately used Mr. Paprocki's—HSB's in-house engineer—$39,710.00 blade-related repair estimate from his desktop review of the turbine, and excluded seal repair. The desktop review was done internally using photographs and documentation from third parties. Ms. Baur determined that the properly-adjusted claim totaled approximately $484,000.00, which failed to meet the policy's $500,000.00 deductible. This total, she said, included HSB's internal estimate of damage repairs from Mr. Paprocki paired with NOVEC's quoted amounts for associated costs from the TGM Customer Job Cost Summary. *See* Hr'g Tr. 94:15-17.

### B. Application of the *Norman* Factors

To begin, Defendant argues that *Norman* factor one—interpretation of policy provisions defining coverage and exclusions—applies in this case because there was a dispute as to what damage was covered vis-à-vis the definition of "accident" in the policy. "[A]pplication [of the policy] inherently requires interpretation," HSB says. Dkt. 116 at 8. The reasonableness of the dispute, HSB continues, weighs in its favor in the *Norman* analysis.

Defendant takes two contradictory positions. First HSB claims a reasonable dispute for coverage based on the interpretation of "accident." But HSB also claims that NOVEC failed to provide supporting documentation for claimed losses, which would render it clearly ineligible for coverage under the applicable policy. In this sense, Defendant claims a clear application of the policy, not an issue of ambiguity or reasonable dispute. If anything, then, HSB calculated the

13

adjustment with knowledge of a significant outstanding variable that was material to the coverage determination.[6] The point of disagreement among experts at trial as to the vibration events, as Defendant explains, only arose after HSB's decision to deny coverage and could not have been the basis of a good faith denial.

Furthermore, the fourth *Norman* factor—whether it appears that the insurer's refusal to pay was used merely as a tool in settlement negotiations—does not materially affect the outcome in this case. Defendant claims it "unquestionably weighs in HSB's favor" here, as there is no evidence that HSB used the denial as a settlement tactic. But if found in HSB's favor, this factor simply demonstrates that HSB did its job in the ordinary course of business, with the good faith presumed among contracting parties. *See State Farm Mut. Auto. Ins. Co. v. Floyd*, 366 S.E.2d 93, 97 (Va. 1988). Defendant fails to explain why a business-as-usual finding would materially offset bad faith findings under other *Norman* factors, or would warrant further discussion in the Court's overall analysis. Factor four's consideration would not have tipped the scales in HSB's favor, and is an improper basis for a Rule 59 motion.

HSB argues that the fifth and final factor—whether the defense the insurer asserts at trial raises an issue of first impression or a reasonably debatable question of law or fact—weighs in its favor because the Parties' experts reasonably disagreed as to the cause of the vibrations that harmed the turbine. A jury determination in NOVEC's favor does not negate a reasonable underlying disagreement, HSB says. Defendant claims it presented, at a minimum, a reasonably

---

[6] HSB claims reasonableness as to the inputs in Ms. Baur's calculation, at least in part, because it was reasonable to accept Mr. Paprocki's expert report. But the question of reasonableness does not consider Mr. Paprocki's qualifications and conclusions in a vacuum. It must also consider the chosen line item values given HSB's knowledge of the insured's contrary—and allegedly yet unsupported—position.

14

debatable question of fact based on the language of the policy, as well as the information gleaned from the investigation, discovery, and expert testimony.

Defendant's argument does not identify an issue of first impression or name any discrete questions of law or fact, but rather states that it simply litigated the issues and presented its defense. It is unclear which issue merits favor under the fifth *Norman* factor, particularly when raised post-judgment. Moreover, if HSB claims the cause and nature of the vibration anomalies as the basis of its argument, that is unpersuasive; NOVEC produced the historian data in support of its vibration theory "[a]fter litigation was well underway in this case," HSB says, thus that data could not have been the basis of any question of fact prior to HSB's denial of coverage. Dkt. 114 at 19. The general question of whether seal damage was included, under factor five, was not shown to be dispositive of coverage and does not carry much weight in the analysis. Again, this factor does not warrant reconsideration pursuant to Rule 59 because the evidence adduced post-judgment does not materially alter the weight of the evidence.

The Court addresses factors two and three in turn.

*1.* Norman *Factor Two: Reasonableness of the Investigation*

Defendant's post-judgment efforts to reverse the bad faith finding fail as to the reasonableness of the investigation. As noted above, the Court will not review in any depth those factual arguments previously heard and considered. The testimony received on January 24 confirms that HSB's reduction of the claim to approximately $484,000.00, just below the $500,000.00 deductible, was unsupported. Plaintiff's invoices indicated potential costs near $1.2 million for the repair of the turbine, and the method with which HSB reduced the number by more than half, ultimately denying the claim, did not demonstrate good faith dealing.

First, there is no explanation for the omission of the $20,000.00 cost to mobilize and demobilize the 350-ton crane, which alone would have triggered a pay-out under *HSB's* chosen approach. Dkt. 115 at 11; *see* Dkt. 115-1, Tab A, Bates HSB 04528. But the overall alterations to and omissions from the documentation NOVEC initially provided were more egregious. HSB conceded coverage for shop time during blade repair, but then refused coverage for costs associated with such repairs, like internal alignments. The basic scope of repair shows that Ms. Baur's use of the $257,149.00 "Base Job Totals" from TGM was clearly inadequate to cover the necessary effort. Dkt. 115-1, Tab B, Bates HSB 04530. To be sure, the TGM change order totals of $163,887.69, not Mr. Paprocki's $39,710.00, raised that amount to $421,036.69, which reflects the actual undertaking. *Id.* HSB includes the $257,149.00 as "Emergency Borescope Debris" from TGM's invoice, as well as change orders for "Specialty Tooling," "OEM Support," and "Mobilization" in the final claim. Pl. Trial. Ex. 41, Bates No. NOVEC 00006146. Change orders 3, 4, 7, 8, 9, 10, and 11 were excluded.[7]

Once again, even assuming, *arguendo,* HSB's scope of work was correct, it improperly discounted Mr. Crahan's estimate. It is undisputed that Ms. Baur relied on Mr. Crahan's analysis of the damage and in the adjustment of the claim. *See, e.g.,* Hr'g Tr. 72:12-14. Yet HSB did not use Mr. Crahan's $399,700.00 cost estimate for the repairs, opting to use a combination of Mr. Paprocki's damage estimate and miscellaneous TGM line items instead. It is also undisputed that Ms. Baur's understanding was that the claim would include costs "for blade replacement,

---

[7] While Change Order 10 "Oil Seal Repair" would presumably have been disputed based on coverage of seal damage, there is no clearly articulated basis for each of these exclusions. Ms. Baur would not accept the bills submitted for the complete refurbishment of the turbine and the associated costs, aside from what had been previously identified. Dkt. 114 at 13. Thus things like wire alignments of the turbine were associated with "a complete refurbishment of the turbine" and were omitted from the adjusted claim. *Id.* at 20.

16

diagnostics, disassembly/reassembly, crane rental and transport." Dkt. 114 at 21 (citing Def. Trial Ex. 3, at HSB 04715). As HSB clearly states, Mr. Crahan's "estimate accounted for the disassembly of the turbine, blade repair, and reassembly of the turbine." *Id.* at 12-13. Defendant continues by clarifying that Mr. Crahan's estimate did not include the cost of the emergency borescope inspection. What Defendant does not acknowledge, however, is that there is no cost for crane rental and its associated labor and mobilization, either. *See* Hr'g Tr. 72:8-9 ("Q: Did [Mr. Crahan] include the cost of the crane? A: I don't see it in this note.") (Baur). Indeed, the total costs for the cranes are estimated in HSB's final numbers as $134,800.00, which does not reflect the standard $20,000.00 mobilization costs. As such, Mr. Crahan's estimate, *according to HSB's scope of coverage*, is $534,500.00 without crane mobilization, and $554,500.00 with it. Both would result in a pay-out. The conceded scope of repair renders Mr. Crahan's estimate higher than both HSB's final estimate and NOVEC's deductible, and Defendant's representation that "[Ms. Bauer] never withdrew the $484,030.39 estimate, despite the fact that Mr. Crahan's estimate was lower," is untrue. Dkt. 116 at 5, Row 6.

Moreover, HSB's final calculation and ultimate denial of coverage does not articulate how Mr. Paprocki's $39,710.00 desktop estimate was the more accurate figure in this instance. The decision to use Mr. Paprocki's estimate is significantly undermined by the fact that he requested detailed information from NOVEC to better inform his analysis, and Ms. Baur has no recollection, record, or notation to say she forwarded the requests to anyone. *See* Dkt. 115 at 13-14; Hr'g Tr. 90:7-14 ("Q: Did you forward these questions from Mr. Paprocki to [Mr. Rainey]? A: I don't recall . . . Q: And if you had forwarded this e-mail, would we see a notation in your claim notes? A: Likely, yes.") (Baur).

Defendant asserts the inverse scenario, that "[t]he record documents Ms. Baur's repeated requests for information and Novec's persistent failure to provide that information at any point in the claims process." Dkt. 116 at 2. But this is also unsupported as it pertains to the reasonableness inquiry. HSB continues to paint a picture of a claim file that lacked adequate documentation of loss, as Ms. Baur's requests for information would indicate. Under Part 7 of the applicable Policy, Defendant maintains that documentation of loss is required from the insured for coverage. Yet, rather than deny coverage based on lack of documentation, HSB instead conceded some coverage and relied on available documentation for remote desktop reviews as a basis for a final adjustment and determination. In this sense, the additional evidence before the Court hurts HSB's bad faith defense if it affects it at all.

*2. Reasonableness of the Evidence in Support of HSB's Denial of Coverage*

Likewise, based on the supplemented facts in evidence, there is no basis on which to disturb the judgment as entered. Facts in evidence at the time of judgment already included, in some capacity, many if not all of the communications and calculations discussed herein. As it was in the Court's Memorandum Opinion (Dkt. 93), discussion of the reasonableness of the investigation is necessarily based on facts in evidence. At bottom, the evidence cited throughout this discussion supports the bad faith finding, and Defendant did not proffer any evidence to upset the balance of the record.[8]

---

[8] Defendant's Reply brief states that the Court's prior rationale in its bad faith ruling "was based on either incomplete evidence or a misunderstanding of the evidence." Dkt. 116 at 2. It includes a table referencing thirteen statements in the Court's Memorandum Opinion of August 15, 2019 which HSB asserts are incorrect. Upon review, the table is largely a re-formatted legal argument rather than a correction that, when considered in the totality of the record, is unpersuasive. The statements from the Memorandum Opinion identified in the Reply—even if, *arguendo*, inaccurate—would not alter the outcome on bad faith.

18

Ms. Crahan's testimony as to the reasonableness of the invoices ultimately would not shift the weight of the evidence. Indeed, Ms. Crahan's comment was so non-specific that she had to testify at the January 24 hearing to explain how her comment might have applied to the underlying invoices, which was unclear given that Ms. Baur chose to include several of TGM's totals but not others. Dr. Ornstein's deposition was largely inconsistent with his reports to HSB, rendering the testimony mostly irrelevant. He submitted conclusions to HSB "with a reasonable degree of engineering certainty," but his testimony cast significant doubt on his conclusions that was absent from his summary reports. He did not produce much documentation for HSB to rely on in its claim adjustment, thus his overall role was a small one, and additional testimony did not change that. Mr. Rainey and Ms. Baur both testified to topics and events familiar to the record. The bulk of the testimony came from Ms. Baur. Her explanations of various communications and her understanding of certain expert opinions were largely unhelpful and certainly did not alter reasonableness considerations that would warrant Rule 59 relief.

Again, the facts do not reasonably support HSB's denial of coverage.[9]

### 3. *Fees, Costs, and Post-Judgment Interest*

Plaintiff requests additional attorney's fees in this matter in the amount of $80,560.88, and an additional $684.38 in costs incurred between July 2019 and March 6, 2020. Dkt. 115 at 25. For many of the reasons stated in the Court's initial grant of attorney's fees to NOVEC, and consistent with the previously-established rate of $507.63, the Court will award NOVEC

---

[9] The admissibility of the email exchange in HSB 5091-94 has some basis, and the Court declines to strike Defendant's discussion of the associated evidence from the record at this time. Dkt. 115 at 18 n.7 (discussing Dkt. 114 at 13 & n.14, Ex. H). Plaintiff is correct, however, that Defendant's supporting brief presents evidence inaccurately in footnote 12. *Id.* at 9 n.12. For the reasons stated in NOVEC's opposition, footnote 12 is improper and will not be considered. *See* Dkt. 115 at 15-16.

additional fees as requested. *See* Dkt. 93 at 7-12. HSB summarily states that the supplemental bills in support of NOVEC's fees raise issues "with regard to the rate, the staffing, vague entries and to some extent, block billing." Dkt. 116 at 14. This statement is offered without support or discussion, and the Court will not apply a percentage reduction to Plaintiff's hours here.

Plaintiff also requests post-judgment interest, "to be calculated based on Virginia's 6% post-judgment interest rate," running from August 16, 2019. Dkt. 115 at 25. Post-judgment interest is appropriate here, running from the date of entry of judgment pursuant to the instant ruling. Unlike for pre-judgment interest, though, "'[f]ederal law, rather than state law, governs the calculation of post-judgment interest in diversity cases.'" *Mulugeta v. Ademachew*, 407 F. Supp. 3d 569, 594 (E.D. Va. 2019) (quoting *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 633 (4th Cir. 1999). Post-judgment interest "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961(a).

## IV. CONCLUSION

For the reasons stated herein, the motion to alter or amend judgment (Dkt. 96) is hereby **DENIED**. Plaintiff is awarded an additional $80,560.88 in fees and $684.38 in costs, and post-judgment interest pursuant to 28 U.S.C. § 1961(a). Judgment shall enter by separate Order.

It is **SO ORDERED**.

August 21, 2020  
Alexandria, Virginia

Liam O'Grady  
United States District Judge